**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAYLEY AMIEL, on behalf of herself and all others similarly situated,<br><br>                      Plaintiff,<br><br>       v.<br><br>EVO Brands, LLC d/b/a Puff Bar,1700 Santa Fe Ave., Unit 420, Los Angeles, CA 90021, and PVG2, LLC, d/b/a Puff Bar, 777 S Alameda St., 2nd Floor, Los Angeles, CA 90021,<br><br>                    Defendants. | Case No. ____24-7327____<br><br>**CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

## <u>SUMMARY</u>

This case seeks relief for consumers who have been misled about the nature and safety of Puff Bar disposable electronic cigarettes. Getting young people hooked on nicotine creates a lifetime of revenue for the tobacco industry. As traditional tobacco products like combustible cigarettes have gone out of style, tobacco companies have reinvented themselves and created a marketplace sensation with electronic cigarettes, also known as vapes. Defendants in this case market their electronic cigarettes to young people, misleading them as to the fact that it is illegal in all states to sell these products to people younger than 21 years of age. Defendants market and have sold, and allow resellers to advertise and sell, Puff Bar nicotine products when these products are illegal, which is misleading and unfair to consumers. Puff Bar electronic cigarettes display "5%" nicotine labels, which misleads consumers into thinking the addictive nature of

these products is lower than it is. Puff Bar electronic cigarettes also are advertised as "tobacco-free." Consumers have long been concerned about the health consequences of tobacco, and a "tobacco-free" promise misleads them into believing that these electronic cigarettes do not have the safety risks associated with tobacco or tobacco-derived nicotine products, or that the products are safer than they really are, when in reality these products pose significant health concerns based on nicotine content.

This lawsuit seeks to hold Defendants accountable for their misleading advertising.

## PREAMBLE

Plaintiff Hayley Amiel ("Plaintiff" or "Amiel") brings this action on behalf of herself and all others similarly situated who purchased Puff Bar electronic cigarettes ("e-cigarettes") during the class period ("Class members"). Plaintiff Amiel alleges that Defendants EVO Brands, LLC and PVG2, LLC d/b/a Puff Bar ("Puff Bar" or "Defendants") have marketed and advertised disposable electronic cigarettes containing nicotine, sold under the brand name of Puff Bar ("Products"), in a misleading and deceptive manner. Defendants have aggressively marketed the Products to attract young buyers, misleading them to believe that it is legal for them to purchase the Products—when in fact it is illegal in all states to sell these Products to consumers younger than 21 years of age. Defendants allow and encourage the sale of the Products nationwide even though the Products are not legal for sale, which is misleading to consumers. Defendants label the Products as containing "5% tobacco-free nicotine," "5% Salt Nic," or simply "5%," without additional details, which misleads consumers to believe the nicotine content is low and/or to underestimate the nicotine content, strength, and addictive nature of the Products. Defendants market and advertise their Products as "tobacco-free," which misleads consumers to think that

the Products are safer than they are. Defendants' conduct violates business and consumer protection law and constitutes a breach of an implied warranty of merchantability. Plaintiff alleges the following based upon the investigation of her counsel and upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

## INTRODUCTION

1.      Puff Bar e-cigarettes are disposable vaping devices that contain nicotine, flavorings, harmful chemicals, and toxins, designed to mimic the experience of smoking traditional combustible cigarettes.

2.      E-cigarettes were originally marketed as a tool to help people quit smoking traditional tobacco cigarettes, though their effectiveness in this regard is debatable.[1]

3.      By being disposable, Puff Bar devices are intended to be used once and then discarded, as opposed to a rechargeable or non-disposable device that can be used multiple times.[2]

4.      The nicotine in e-cigarettes is in a liquid form and is stored in a cartridge that is usually attached to the battery.[3]

5.      While traditional cigarettes still vastly outpace e-cigarettes among the adult population, e-cigarettes are the most commonly used tobacco product among youth.[4]

---

[1] *About E-Cigarettes (Vapes)*, Centers for Disease Control and Prevention ("CDC") (May 15, 2024), https://www.cdc.gov/tobacco/e-cigarettes/about.html?CDC_AAref_Val=https://www.cdc.gov/tobacco/basic_information/e-cigarettes/about-e-cigarettes.html.

[2] *E-Cigarette, Or Vaping, Products Visual Dictionary*, CDC, https://www.cdc.gov/tobacco/basic_information/e-cigarettes/pdfs/ecigarette-or-vaping-products-visual-dictionary-508.pdf (last visited Sept. 26, 2024).

[3] *Id.*

[4] *Results from the Annual National Youth Tobacco Survey 2023*, FDA (June 26, 2024), https://www.fda.gov/tobacco-products/youth-and-tobacco/results-annual-national-youth-tobacco-survey.

6.      Puff Bar, in particular, became a dominant e-cigarette brand among young people.[5]

7.      Consumer interest and demand for these Products has risen because of Puff Bar's "5%" nicotine labels, which mislead consumers to believe the nicotine content is low and/or to underestimate the nicotine content, strength, and addictive nature of the Products.

8.      Interest in the Products has also peaked because the Defendants represent the Products as "tobacco-free." Consumers associate health concerns with tobacco, and the "tobacco-free" labeling leads them to believe that the Products do not have the safety risks associated with tobacco or tobacco-derived nicotine Products, or that the Products are safer than they really are, when in reality these products pose significant health concerns. Puff Bar's popularity among youth arises also from Defendants' misleading and aggressive marketing towards young people, including selling the Products in a multitude of flavors, *see infra* Section I, and because Defendants have evaded government regulations in various ways.

9.      Puff Bar Products are available for sale in at least twenty different flavors, ranging from Banana Ice to Mango Pineapple Ice.[6]

10.     The Food and Drug Administration ("FDA"), aware of the flavor appeal to young people, banned flavored vape cartridges in 2020.[7]

---

[5] *See infra*, Section I.
[6] *See infra*, Section I; *see also PUFF BAR Disposable Device*, EliquidStop, https://www.eliquidstop.com/products/puff-bar-disposable-device (last visited Sept. 26, 2024) (EliquidStop is an online vape store founded by Puff Bar Co-CEOs Patrick Beltran and Nick Minas).
[7] *FDA finalizes enforcement policy on unauthorized flavored cartridge-based e-cigarettes that appeal to children, including fruit and mint*, FDA (Jan. 2, 2020), https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children.

CLASS ACTION COMPLAINT

11.    Puff Bar managed to elude the FDA ban due to a gap in the policy that excluded disposable e-cigarettes. Shortly after the ban, Puff Bar's website specifically emphasized the Products' disposable nature, mentioning at least seven times on the homepage that they are "disposable" and can be "thrown away." The following image is a screengrab from the Puff Bar homepage from May 21, 2020:



12.    When the FDA informed Defendant Puff Bar in July 2020 that it could not sell its e-cigarettes because it had not received authorization to sell tobacco products, Puff Bar temporarily paused production and then promptly found another loophole: synthetic nicotine.[8]

13.    By using synthetic nicotine, Defendant Puff Bar was able to again evade the purview of the FDA, as its Products were no longer considered "tobacco products." Again, this attribute was emphasized on Defendant Puff Bar's website. The following image is a screengrab from    Defendant    Puff    Bar's    homepage    from    February    25,    2021.

---

[8] *FDA Notifies Companies, Including Puff Bar, to Remove Flavored Disposable E-Cigarettes and Youth-Appealing E-Liquids from Market for Not Having Required Authorization*, FDA (July 20, 2020), https://www.fda.gov/news-events/press-announcements/fda-notifies-companies-including-puff-bar-remove-flavored-disposable-e-cigarettes-and-youth; *What's the Deal with Synthetic Nicotine?*, Pub. Health L. Ctr. (May 16, 2022), https://www.publichealthlawcenter.org/commentary/220223/whats-deal-synthetic-nicotine.

CLASS ACTION COMPLAINT

# We've got you covered

 **Free Shipping Over $25**      **Authentic Taste**      **Designed in the US**      **Tobacco-Free Nicotine**

As of February 25, 2023, the website has swapped the "Tobacco-Free Nicotine" label icon seen below for "Lab Tested."

14.     Having been hooked by Puff Bar and other brands, the youth market craved continued access to flavored vapes, and Puff Bar was able to dominate that market by fulfilling that craving when almost every other flavored brand was no longer available due to the FDA ban.

15.     In March 2022, Congress closed the loophole for synthetically derived tobacco products and banned the sale of all e-cigarettes unless the company received permission from the FDA.[9] Defendants do not have permission to sell the Products, making the sale of these Products illegal.[10]

16.     Around December 2022, Puff Bar removed nicotine e-cigarettes from its website. But these Puff Bar Products remain widely available for sale online and at brick-and-mortar retailers.[11] In fact, in May 2023, the FDA issued warning letters to 30 retailers for illegally selling unauthorized products, including Puff Bar Products.[12]

---

[9] *Requirements for Products Made with Non-Tobacco Nicotine Take Effect April 14*, FDA (Apr. 13, 2022), https://www.fda.gov/tobacco-products/ctp-newsroom/requirements-products-made-non-tobacco-nicotine-take-effect-april-14.

[10]     *Searchable Tobacco Products Database*, FDA (Sept. 13, 2024), https://www.accessdata.fda.gov/scripts/searchtobacco/.

[11]     *Puff Bar Original Disposable Device | $15.88 | 5% Nicotine*, Vapor Boss, https://vaporboss.com/products/puff-bar-disposable-vape (last visited Sept. 26, 2024).

[12] *FDA Conducts Retailer Inspection Blitz, Cracks Down on Illegal Sales of Popular Disposable E-cigarettes*, FDA (May 31, 2023), https://www.fda.gov/news-events/press-announcements/fda-conducts-retailer-inspection-blitz-cracks-down-illegal-sales-popular-disposable-e-cigarettes.

CLASS ACTION COMPLAINT

17.    Allowing their nicotine Products to be advertised and marketed to people all around the country, when it is, in fact, illegal to sell people these Products under law, is misleading and unfair.

18.    Even before the Products were made illegal generally, they could not be lawfully sold to young adults or adolescents. On December 20, 2019, Congress passed "Tobacco 21" to outlaw the sale of electronic cigarettes, which includes Puff Bar Products, to people under 21 years of age.[13] Therefore, Defendants' aggressive marketing to young people is misleading about a material fact—that the young adult cannot purchase the Products legally.

19.    Defendants engage in unfair and deceptive advertising by marketing and selling and allowing their nicotine Products to be advertised and sold by resellers when the Products are illegal; by targeting young people when it is illegal for people younger than 21 to purchase the Products; by representing that the Products contain 5% nicotine, which is misleading and ambiguous; and by marketing the Products as "tobacco-free," which misleads consumers about the safety of the Products. Defendants' representation that the Products are "tobacco-free" also constitutes a breach of an implied warranty of merchantability.

20.    Defendants[14] have therefore violated business and consumer law. Plaintiff Amiel

---

[13] *Tobacco 21*, FDA (Aug. 29, 2024), https://www.fda.gov/tobacco-products/retail-sales-tobacco-products/tobacco-21.

[14] Discovery is needed to better understand the inner workings of Defendants, including, the precise relationship between Puff Bar and resellers. Although Puff Bar promises transparency, *see Are Puff Bars Banned?*, Puff Bar, https://puffbar.com/blogs/puff-post/are-puff-bars-banned (last visited Sept. 26, 2022), it is in fact a company shrouded in secrecy. When Puff Bar entered the U.S. market in 2019, it was owned by Cool Clouds Distribution. In early 2020, the company was sold to a Chinese manufacturer, DS Technology Licensing LLC. At some point in time, Patrick Beltran and Nick Minas became employees for Puff Bar and then self-identified as the current owners and co-CEOs of Puff Bar. Their status as owners, how they acquired the brand, and where they received the financing for such a large purchase, however, remain unknown or unverified. For a company that purports to pride itself on transparency, there is little to no information readily accessible to the public about Puff Bar, such as its corporate structure, its relationship with resellers, and whence its ingredients are sourced. Even the location of the company is unclear, as multiple addresses in Los Angeles and Glendale, California are publicly listed.

brings this class action on behalf of herself, and all others similarly situated, seeking equitable and monetary relief.

21.    Plaintiff seeks to hold Defendants accountable for misleading representations made in the past that caused economic injury, and also to hold Defendants accountable for the representations and sale of the Products through resellers. Although it was illegal to sell the Products to people younger than 21 beginning December 2019, Defendants targeted and sold the Products to young people up until December 2022. From then on, resellers—with Puff Bar's knowledge—have marketed and sold the Products to people younger than 21 years of age. Though the Products were illegal for sale to everyone in the United States as of March 2022, Puff Bar advertised and sold the Products in the United States up until December 2022. Since then, resellers have been marketing and selling the Products throughout the States. Defendants directly advertised and sold the Products with 5% nicotine labels up until December 2022, and thereafter resellers have been selling the Products with the 5% nicotine labeling. Defendants marketed the Products as tobacco-free up until February 2023.

22.    Defendants remain responsible for the impact their Products have on consumers regardless of who was actually selling the Product directly to consumers. Defendants placed the representations along with the Products into the stream of commerce, intending that consumer reliance on those misrepresentations would boost the sale of the Products to the eventual benefit of Defendants, both in terms of direct sales and in terms of reputation and trust.

---

This massive amount of secrecy is troubling for a company with sales of more than $100 million a year and a youth consumer base in the hundreds of thousands. *See Puff Bar CEOs on the company behind the popular e-cigarette brand: "There was a lot of shadowiness before,"* CBS News (Nov. 19, 2021), https://www.cbsnews.com/news/puff-bar-e-cigarette-ceos-fda/.

23.    Upon information and belief, Defendants created the Product design and specifications, including, for example, the branding and representations on the packaging; the ingredients in the vaping liquids, including the type and concentration of nicotine used, flavorings, base ingredients, and any additives; the device casing and aesthetics; the overall build quality; and how long the device should last. Defendants outsource the manufacturing to China.[15] Defendants then oversee the manufacturing process, working closely with the contract manufacturers to ensure that the final Products meet their design and specifications.

24.    Once the Products are in the United States, Defendants act as the main distributor, supplying the Products to various retailers, both online and in physical stores. Defendants manage these channels, ensuring that the Products are available in locations where they will reach the target market.

25.    To this day, Defendants continue to benefit from the Products and their representations about the Products. Defendants' brand presence and reputation prosper from ongoing advertising and visibility. Defendants continue to receive licensing fees and royalties from their intellectual property rights to Puff Bar.[16] Defendants continue to import and distribute their Products and sell them to resellers for profit.

26.    Defendants—as Product designers, manufacturing overseers, and distributors— are responsible for what they have placed into the marketplace. The Products as designed and distributed by Defendants are still in circulation. The representations are live and continue to

---

[15] Due to the ambiguity around Puff Bar, Plaintiff cannot be certain whether Defendants outsource the manufacturing to China. While China is the most likely source, Defendants may own the manufacturing process, in which case Defendants remain responsible for the Products throughout their lifecycle.

[16]    *Puff    Bar*,    Trademark    Elite,    https://www.trademarkelite.com/trademark/trademark-search.aspx?sw=puff%20bar&hline= (last visited Sept. 26, 2024).

pose a risk of harm to consumers. Defendants have a continuing responsibility to mitigate or prevent that harm.

27.     Plaintiff seeks to hold the Defendants accountable for their misleading representations and omissions, regardless of who at any given time was selling the Product directly to consumers.

## JURISDICTION AND VENUE

28.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d)(2)(A), the Class Action Fairness Act.  There are more than 100 members in the proposed class. Plaintiff is a citizen of New York and consents to this Court's jurisdiction. Defendants are both Delaware limited liability companies with headquarters in California.

29.     The amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs.

30.     This Court has personal jurisdiction over Defendants in that they regularly conduct and transact business in this District, purposefully avail themselves of the laws of New York, have marketed and have allowed their Products to be marketed with "5%," "5% Nicotine," or "5% Salt Nic" representations to consumers in New York, have targeted their marketing to young people in New York, have marketed and have allowed their Products to be marketed with "tobacco-free" representations to consumers in New York, and have sold and allow the sale of their Products in numerous stores located in New York.

31.     Venue is proper in this District under 28 U.S.C. § 1391(a). Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading

marketing and advertising regarding the nature of the Products and sales of the Products at issue, occurred within this District.

## **PARTIES**

32.    Defendant EVO Brands LLC is a Delaware limited liability company with an address at 1700 Santa Fe Ave., Unit 420, Los Angeles, CA 90021.[17]

33.    Defendant PVG2, LLC is a limited liability company incorporated in Delaware with a business address in California at 777 South Alameda St., 2nd Floor, Los Angeles, CA 90021.

34.    Defendants design, sell, market, promote, and distribute Puff Bar disposable e-cigarettes, among other products.

35.    Plaintiff Amiel is a citizen of the State of New York and a resident of Rockland County. At all times mentioned herein, Plaintiff Amiel was and is an individual consumer over the age of 18. During the Class Period, as defined *infra* ¶ 111, Plaintiff Amiel was younger than 21 years of age.

36.    Plaintiff Amiel purchased Defendants' Puff Bar Vape Products[18] in the following flavors: Banana, Mango, Cafe Latte, Blueberry Ice, and Clear.

37.    Plaintiff Amiel purchased Defendants' Puff Plus Products in the following flavors: Strawberry Banana, Lychee Ice, Pina Colada, Guava Ice, Banana Ice, Mamba, Mixed

---

[17] Due to the confusion about Defendants' company headquarters, the addresses were taken from an FDA letter to the Defendants. Upon information and belief, these addresses are valid. *See Warning Letter: EVO Brands, LLC and PVG2, LLC d/b/a Puff Bar*, FDA (Oct. 6, 2022), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/evo-brands-llc-and-pvg2-llc-dba-puff-bar-643091-10062022.

[18] Specific Puff Bar devices have different names, *e.g.*, "Flow" or "Plus," which indicate the number of "puffs" a user gets out of it. *See How Long Does A Puff Bar Last?*, Puff Bar, https://puffbar.com/blogs/puff-blogs/how-long-does-puff-bar-last (last visited Sept. 26, 2024).

Berries, Lush Ice, Strawberry Kiwi, Blue Razz, Melon Ice, Apple Ice, and Banana Ice Cream.

38.    Plaintiff Amiel purchased Defendants' Puff Flow Products in the following flavors: Banana Ice, Mango, Blue Razz, Blueberry Ice, Lychee Ice, Kiwi Strawberry, Guava Ice, and Watermelon.

39.    Plaintiff Amiel purchased Defendants' Products, as described in the foregoing paragraphs, between October 2019 and January 2021 and between April 2022 and August 2023. Plaintiff purchased Products once a week during these times.

40.    Plaintiff Amiel purchased Defendants' Products in Rockland County, New York, and Wildwood, New Jersey. Plaintiff purchased the Products at the following locations: Ivy Stationers, 14 Thiells Mt. Ivy Road, Unit 7, Pomona, NY 10970; Zava Flow Inc., 38-40 N. Middletown Road, Nanuet, NY 10954; and at the Wildwood Boardwalk, Wildwood, NJ 08260.

41.    Plaintiff Amiel, like many young adults, was attracted to the Products because of the variety of flavors offered, as well as the Products' general marketing towards young people.

42.    Plaintiff Amiel, when she purchased the Products, saw and believed that the Products, in general, were legal for sale.

43.    Plaintiff Amiel, when she purchased the Products, saw and believed that the Products were lower in nicotine than they actually were based on the fact that the Products were marketed as containing 5% nicotine.

44.    Plaintiff Amiel, when she purchased the Products, saw and believed that the Products lacked the safety risks associated with tobacco and tobacco-derived nicotine products and that the Products were safer than they were based on the fact that they were advertised as "tobacco-free."

45.     Plaintiff Amiel is a user of vaping devices. Like so many young people, she became hooked on such products without knowing the dangers that Puff Bar conceals. Because of Defendants' deceptive marketing, she became a consumer without fully comprehending that she was beginning an addictive habit. Plaintiff Amiel, while working hard to discontinue vaping, remains a consumer and has a strong interest in having full disclosure regarding the Products. Plaintiff Amiel wishes to be able to make the best choices among e-cigarettes, in terms of health dangers, accurate description of nicotine, tendency for increased addiction through the use of flavors, and price.

## **FACT ALLEGATIONS**

**I.      Advertising and Selling and Allowing the Products to Be Advertised and Sold Is Misleading Because the Products Are Illegal.**

46.     Defendants' Products have been illegal for sale to minors since December 2019, and illegal for sale to all consumers throughout the United States since March 2022. Despite this, Defendants continued to market and sell the Products, and allowed and encouraged resellers to do the same, even in the face of their illegality.

**A.      Defendants' Advertising Targeting Young People Is Misleading Because the Sale of the Products to Consumers Younger Than 21 Years Is Unlawful.**

47.     Defendants' marketing targets minors and young adults, despite the illegality of selling these Products to consumers younger than 21 years of age. The advertising, therefore, is misleading about a material fact—that minors and young adults cannot legally purchase the Products, and that their use of the Products is explicitly against the policy of New York, every other state, and the federal government.

48.     As of November 13, 2019, New York Public Health Law, Article 13-F, Section 1399-cc, prohibits the sale of "tobacco products, herbal cigarettes, liquid nicotine, shisha or electronic cigarettes" to individuals under 21 years of age.[19] On December 20, 2019, Congress passed a similar law called "Tobacco 21," outlawing the sale of electronic cigarettes to people under 21 in all states.[20]

49.     Puff Bar advertisements, notwithstanding the unambiguous legislative mandate, target young people in various ways.

50.     One method is through flavors. Young people are attracted to flavors.[21] The data on this fact are staggering.[22] For example, in 2023, more than 2.1 million middle and high school students reported currently using e-cigarettes.[23] Almost nine in ten, or 87.6%, of those current users chose flavored e-cigarettes.[24]

51.     Nearly 81% of youth ages 12 to 17 who had ever used tobacco products reported that the first product they used was flavored.[25]

52.     The FDA determined that, even though it was already illegal to sell e-cigarettes to consumers younger than 21, the lure of flavored e-cigarettes was too strong; the FDA then

---

[19]     *Legislation   SECTION   1399-CC*,   N.Y.   S.   (Nov.   15,   2019), https://www.nysenate.gov/legislation/laws/PBH/1399-CC.

[20]     *Tobacco 21*, *supra* note 13.

[21]     *Flavored tobacco use among youth and young adults*, Truth Initiative (June 28, 2021), https://truthinitiative.org/research-resources/emerging-tobacco-products/flavored-tobacco-use-among-youth-and-young-adults.

[22]     *Id.*; *see also Results from the Annual National Youth Tobacco Survey 2022*, FDA (Dec. 20, 2022), archived at   https://public4.pagefreezer.com/browse/FDA/01-11-2023T15:52/https://www.fda.gov/tobacco-products/youth-and-tobacco/results-annual-national-youth-tobacco-survey.

[23]     *Results from the Annual National Youth Tobacco Survey 2023*, FDA (June 26, 2024), https://www.fda.gov/tobacco-products/youth-and-tobacco/results-annual-national-youth-tobacco-survey.

[24]     *Id.*

[25]     *Flavored tobacco use among youth and young adults*, *supra* note 21.

issued a complete ban of e-cigarette flavors that appeal to minors and young adults.[26]

53.    Despite the ban, Defendants continued to market and sell Products to minors until December 2022. Since then, Defendants have relied upon their resellers to market and sell the Products to minors. The Products are sold in a wide range of flavors, targeting young people. While the exact number of flavors can vary over time and across different product lines, the Products are offered in more than twenty different flavors at any given time. These include options like Blueberry Ice, Banana Ice, Cool Mint, Watermelon, Peach Ice, Grape, Mango, and Strawberry.[27] The images below depict the packaging of some of these flavors.



---

[26] *FDA finalizes enforcement policy on unauthorized flavored cartridge-based e-cigarettes that appeal to children, including fruit and mint,* FDA (Jan. 2, 2020), https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children.
[27] *What Are Puff Bars? (Brand, Types, Flavours, Legality)*, IndeJuice (Oct. 24, 2023), https://indejuice.com/vape-guides/what-are-puff-bars.

CLASS ACTION COMPLAINT





54.    Even beyond the array of flavors, Defendants have found other ways to target teenagers and young people in their marketing.

55.    Some of Puff Bar's advertisements have preyed upon the stress young people felt during the Covid pandemic,[28] with language like "it's the perfect break from . . . parental texts," as in the marketing image depicted below.[29]



56.    Other advertisements speak to the need for young people to feel included,[30] for example depicting young people vaping and encouraging consumers to buy Puff Bar Products before they sell out for the fourth time in the past year.[31]

---

[28] Sheila Kaplan, *Lawmakers Say Puff Bar Used Pandemic to Market to Teens*, N.Y. Times (June 2, 2020), https://www.nytimes.com/2020/06/02/health/puff-bar-teens.html.
[29] *Id.*
[30] Natalie Rahaal, *Lawmakers urge FDA to pull 'Puff Bars' from the market*, Daily Mail (June 3, 2020), https://www.dailymail.co.uk/health/article-8384581/Lawmakers-urge-FDA-pull-Puff-Bar-e-cigarettes-market.html.
[31] *Id.*

57.     Puff Bar has disputed allegations that it is enticing minors and young people, previously stating on its website that it is continuing "to build on national program to reduce underage use."[32] But that same website showed a lack of commitment to this cause; the landing contained only *Lorem Ipsum* placeholder text:



58.     Similarly, the link to download a report on "[o]ur Actions since inception to prevent underage purchase & use" took the user to an error screen stating, "The page you were looking for does not exist."[34]

---

[32] *Underage Use Prevention*, Puff Bar, https://puffbar.com/pages/underage-use-prevention, archived at https://web.archive.org/web/20220525221715/https://puffbar.com/pages/underage-use-prevention.
[33] *Id.*
[34] *Id.*

59.    When asked why Puff Bar continues to sell flavored e-cigarettes despite their massive popularity among underage smokers, Patrick Beltran and Nick Minas, Puff Bar's co-CEOs, said that it is because adults like flavors too, analogizing to the fact that some adults like drinking cocktails rather than straight liquor.[35]

60.    The e-cigarette industry has continuously tried to shift blame for youth e-cigarette addiction onto retailers and poor enforcement. On this topic, co-CEO Beltran stated, "I think the governments need to do a better job on going after retailers and the distribution channels that are actually pushing these products out there."[36]

61.    While better enforcement would help alleviate youth and young adult nicotine addiction, the larger catalyst is that companies like Puff Bar intentionally create and market products to appeal to young consumers.

62.    Defendants' marketing towards minors and young people is intentional and mirrors the successful tactic employed by traditional tobacco companies of the past, who preyed on young people's susceptibility to predatory marketing and tendency to poor decision-making.[37]

63.    Studies show that young people's brains are not fully developed or capable of understanding the consequences of actions, which affects this age group's ability to make good decisions about health and general welfare.[38]

---

[35] *Puff Bar CEOs on the company behind the popular e-cigarette brand: "There was a lot of shadowiness before,"* CBS News (Nov. 19, 2021), https://www.cbsnews.com/news/puff-bar-e-cigarette-ceos-fda/.

[36] *Id.*

[37] Leslie Cantu, *National survey indicates more young adults begin tobacco use with vaping, not cigarettes*, Med. Univ. of S.C. (Nov. 13, 2023) https://hollingscancercenter.musc.edu/news/archive/2023/11/13/national-survey-indicates-more-young-adults-begin-tobacco-use-with-vaping-not-cigarettes.

[38] Mariam Arain, et al., *Maturation of the adolescent brain*, 9 Neuropsychiatric Disease and Treatment 449–61 (Apr. 2, 2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3621648/.

64.    The prefrontal cortex, which is responsible for higher-order cognitive functions such as decision-making, impulse control, and reasoning, continues to develop into the mid-twenties.[39] This means that adolescents and young adults do not process information, assess risks, or make decisions in the same way that fully matured adults do. Thus, this population is vulnerable to e-cigarette advertisements and substance abuse.[40]

65.    One study found that adolescents have low vaping media literacy, meaning they have difficulty determining when vaping advertisements use manipulative imagery and misleading information: "Youths are vulnerable to tobacco companies' advertising promotions and receptive to E-cigarette marketing, which in turn increase the likelihood of future E-cigarette initiation."[41]

66.    Defendants' deliberate marketing toward minors and young people has worked. In 2021 and 2022, Puff Bar was the most popular brand of e-cigarettes among youth.[42]

67.    Through the vast array of flavors intentionally created to attract young adult buyers, and through various other schemes, Defendants market the Products to young people, implying and suggesting that the Products can be sold to them, when in fact they cannot.

---

[39]    *The Teen Brain: 7 Things to Know*, National Inst. of Mental Health, https://www.nimh.nih.gov/health/publications/the-teen-brain-7-things-to-know (last visited Aug. 31, 2024); *see also* Sunita Bava & Susan F. Tapert, *Adolescent Brain Development and the Risk for Alcohol and Other Drug Problems*, 20 Neuropsychol Rev. 398–413 (Aug. 10, 2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2988999/.

[40]    David M. Lydon et al., *Adolescent Brain Maturation and Smoking: What We Know and Where We're Headed*, 45 Neuroscience & Biobehav. Rev. 323–42 (Sept. 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4451244/.

[41]    Hongying Daisy Dai et al., *Vaping Media Literacy, Harm Perception, and Susceptibility of E-Cigarette Use Among Youth,* 63 Am. J. of Preventative Med. 852-60 (Nov. 2022), https://www.sciencedirect.com/science/article/abs/pii/S0749379722003245; Maciej L. Goniewicz et al., *Nicotine Levels in Electronic Cigarette Refill Solutions: A Comparative Analysis of Products From the U.S., Korea, and Poland*, 26 Int'l J. Drug Pol'y 583 (June 2015), https://pubmed.ncbi.nlm.nih.gov/25724267/.

[42]    *Results from the Annual National Youth Tobacco Survey 2022*, FDA (Dec. 20, 2022), https://public4.pagefreezer.com/browse/FDA/01-11-2023T15:52/https://www.fda.gov/tobacco-products/youth-and-tobacco/results-annual-national-youth-tobacco-survey.

CLASS ACTION COMPLAINT

Defendants, therefore, misrepresent a material fact about the Products—that they cannot legally sell the Products to people younger than age 21.

68.    Defendants have done this to create demand among young people for clandestine acquisition and use of Puff Bar Products, hooking them on this nicotine before they are old enough to make rational decisions about the use of a harmful and addictive substance.

**B.    Allowing Their Nicotine Products to Be Advertised and Sold by Third Parties When the Products are Illegal Is Misleading and Unfair.**

69.    Since 2019, these Products have been illegal for individuals younger than 21 years of age. In 2022, they became illegal for sale to anyone.

70.    In March 2022, Congress closed the loophole for synthetically derived tobacco products. Legislation signed by the President extended the FDA's jurisdiction to products "containing nicotine from any source," not just nicotine derived from tobacco.[43] Any company that wished to continue selling e-cigarettes was required to submit a premarket application to the FDA by May 14, 2022.[44]

71.    Thus, to be sold legally in the United States, Puff Bar Products must have an authorized marketing order from the FDA.[45] Defendants have not acquired such an order, and thus their Products are not legal for sale.[46]

---

[43] *Requirements for Products Made with Non-Tobacco Nicotine Take Effect April 14*, FDA (Apr. 13, 2022), https://www.fda.gov/tobacco-products/ctp-newsroom/requirements-products-made-non-tobacco-nicotine-take-effect-april-14.
[44] *Id.*
[45] *See, e.g.*, *Warning Letter, E-Juice Vapor, Inc. MARCS-CMS 657154—May 31, 2023*, FDA (May 31, 2023), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/e-juice-vapor-inc-657154-05312023 (regarding Puff Bar 300 Disposable—Cucumber and Puff Bar 300 Disposable—Grape).
[46] *Searchable Tobacco Products Database, supra* note 10.

72.     Despite the legislation, Defendants continued selling the Products on their website until December 2022, and since then have relied upon resellers to market and sell the Products.

73.     Marketing and selling and then allowing their nicotine Products to be sold and marketed to people all around the country, when it is in fact illegal to sell these Products, is misleading and unfair to consumers.

II.      **Defendants' "5%" Nicotine Labeling Is Ambiguous and Misleads Consumers Regarding The Nicotine Levels and Addictive Potential of the Products.**

74.     As shown below, Defendants represent the Products to contain "5%" [nicotine].[47]



_____

[47] *Puff Bar Original Disposable Device | $15.88 | 5% Nicotine, Vapor Boss*, *supra* note 11.

75.     A Puff Bar e-cigarette labeled as 5% containing 400 puffs (the minimum amount available) has as much nicotine as two-to-three ***packs*** of traditional cigarettes.[48]

76.     Further, the use of synthetic nicotine salts means that the Products are inhaled more easily and with less irritation to the throat than freebase nicotine.[49]

77.     Representations such as "5% tobacco-free nicotine," "5% Salt Nic," and "5%" are ambiguous, and without additional detail, these representations mislead consumers to believe that the Products contain low amounts of nicotine and/or to underestimate the nicotine content, strength, and addictive nature of the Products. How much nicotine is being absorbed is material for consumers because nicotine is an addictive chemical with known harmful effects.

78.     Sarper Taskiran of the Child Mind Institute explains the concern about Defendants' style of e-cigarette marketing: "It's not transparent at all. It says 5% nicotine, which sounds like nothing, so teens think 95% is water weight or vapor."[50]

79.     According to studies conducted in 2021, adult,[51] young adult, and adolescent[52] consumers have difficulty understanding nicotine concentrations presented as % nicotine.

---

[48] Dr. Karita Nussbaum, *Puff Bars: The New Era Of Disposable Vaping, Child & Adolescent Behavioral Health*, Child and Adolescent Behav. Health (July 6, 2021), https://www.childandadolescent.org/my-post.

[49] Mays Shamout, et al., *Notes from the Field: Characteristics of E-cigarette, or Vaping, Products Confiscated in Public High Schools in California and North Carolina — March and May 2019*, 69(42) CDC, Morbidity & Mortality Wkly. Rep. 1552–54 (Oct. 23, 2020), http://dx.doi.org/10.15585/mmwr.mm6942a7.

[50] Katherine Martinelli, *Teen Vaping: What You Need to Know*, Child Mind Institute, https://childmind.org/article/teen-vaping-what-you-need-to-know/#:~:text=Because%20of%20these%20high%20nicotine (last visited Aug. 31, 2024).

[51] Meghan E. Morean et. al., *Adults Who Use E-cigarettes Have Difficulty Understanding Nicotine Concentrations Presented as mg/ml and Percent Nicotine*, 120 Addictive Behav. 106965 (Sept. 2021), https://www.sciencedirect.com/science/article/abs/pii/S0306460321001507.

[52] Meghan E. Morean et al., *Adolescents and Young Adults Have Difficulty Understanding Nicotine Concentration Labels on Vaping Products Presented as mg/mL and Percent Nicotine*, Nicotine Tobacco Rsch. 1389–97 (Aug. 2021), https://pubmed.ncbi.nlm.nih.gov/33433626/.

80.    The studies also found that % nicotine does not accurately convey nicotine strength to users.[53]

81.    People who use e-cigarettes had difficulty translating % nicotine into a meaningful understanding of nicotine strength.[54]

82.    Users were more likely to underestimate than to overestimate nicotine strength based on % labels.[55]

83.    These studies have raised concerns about inadvertent exposure to high nicotine levels.[56]

84.    The studies advocated for a "simplified nicotine concentration labeling system" to "improve public knowledge."[57]

85.    Additionally, a study of 3,000 high school students published in 2019 found that students were more likely to perceive JUUL e-cigarettes (a Puff Bar competitor) as having "low" or "medium" nicotine strength after being told they contained 5% nicotine.[58] Only about one-fifth of students perceived 5% nicotine as a "high" concentration.[59]

86.    Even resources aimed at providing truthful information to e-cigarette users demonstrate the ambiguity of the representations, highlighting consumer confusion. Vaping360, a website designed to "provide accurate information about vaping and build a global

---

[53] Meghan E. Morean, *supra* note 51; Meghan E. Morean, *supra* note 52.
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] Meghan E. Morean et al., *Adolescents' Awareness of the Nicotine Strength and E-Cigarette Status of JUUL E-Cigarettes*, 204 Drug and Alcohol Dependence 107512 (Nov. 1, 2019), https://pubmed.ncbi.nlm.nih.gov/31487572/.
[59] *Id.*

community,"[60] contains an article attempting to explain the differences between vape concentrations, content, and strength: "E-liquids come in strengths that start at zero nicotine and go up to over 50 mg/mL. You may have also seen nicotine strengths expressed as percentages instead of concentrations. All this can be confusing at first, but it doesn't have to be!"[61]

87.    The article goes on to explain the math needed to convert percentages to mg/mL.

88.    Multiple comments in response to the article highlight the confusion, with questions like these:

"So is 5% a lot of nic salt in a 30ml bottle?";

"1st time i use 25mg/ml nicotine. Now i use 3.5% mg. Tell me witch is strong nicotine";

"I am sooo confused with all the infos., calculations mg, ml, % etc. Can i please know how many cigarettes have I « vaped » in the last 4 days approximately?"[62]

89.    The misleading representations about the Products lead users to believe they will not become addicted to e-cigarettes like Puff Bar Products.[63]

90.    Although the Puff Bar website and certain Puff Bar Products state that the Products contain nicotine, such a statement does nothing to help consumers understand the amount of nicotine in the Products, how it compares to traditional cigarettes, how much nicotine is delivered, or its likely effect on them.

91.    Puff Bar's Products identify the nicotine content in different ways on different Product formulations, packaging, and marketing—including "5%," "5% nicotine," and "5% Salt

---

[60] *Who We Are*, Vaping360, https://vaping360.com/about/ (last visited Sept. 26, 2024).
[61] *Nicotine Strengths: How to Choose What's Right for You*, Vaping360 (Feb. 8, 2024), https://vaping360.com/learn/nicotine-strengths-percentages/.
[62] *Id.*
[63] *See, e.g.*, Kathleen Raven, *Nicotine Addiction From Vaping Is a Bigger Problem Than Teens Realize*, Yale Med. (Mar. 19, 2019), https://www.yalemedicine.org/news/vaping-nicotine-addiction.

Nic." As stated above, "5%" and "5% nicotine" are deceptive and lack context. Similarly, the meaning of "5% Salt Nic" is unclear. The average consumer does not have a chemistry degree or experience in the formulation of synthetic nicotine.

92.    Because of Puff Bar's misleading language and lack of transparency surrounding the addictive nature of 5% nicotine, reasonable customers are misled.

**III.    Defendants' "Tobacco-Free" Representations Mislead Consumers.**

93.    In February 2021, Defendants Puff Bar reintroduced the Products, claiming that it now used "tobacco-free" nicotine.[64]



65

---

[64] Julia Chen-Sanke et al., *Effect of A "Tobacco-Free Nicotine" Claim on Intentions and Perceptions of Puff Bar E-cigarette Use Among Non-Tobacco Using Young Adults*, 32 Tobacco Control 501–04 (July 2023), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9035474/.
[65] *Puff Bar Disposable Device*, eliquidstop, https://eliquidstop.com/products/puff-bar-pre-filled-disposable-device (last visited Sept. 26, 2024).

# We've got you covered

 **Free Shipping Over $25**      **Authentic Taste**      **Designed in the US**      **Tobacco-Free Nicotine**

94.     Because consumers have traditionally been concerned about the health consequences of tobacco, "tobacco-free" misleads consumers, especially young people, to believe that the Products do not have the safety risks associated with tobacco or tobacco-derived nicotine Products, or that the Products are safer than they really are.[66]

95.     The "tobacco-free" representation is material as to a key fact: how healthy the Products are. Consumers care about their health.[67]

96.     Perceived health benefits have proven to be a primary reason why people use "tobacco-free" e-cigarettes.[68]

97.     A study examining Puff Bar's "tobacco-free" nicotine claim found that viewing the tobacco-free nicotine claim causes non-tobacco-using young adults to develop higher intentions of using Puff Bar Products along with lower harm perceptions and negative expectancy of using the Products.[69]

---

[66] *See, e.g.*, Danielle R. Davis et. al., *Why Young Adults Use Tobacco-Free Nicotine E-Cigarettes: An Analysis of Qualitative Data*, 150 Addictive Behav. 107925 (Mar. 2024), https://www.sciencedirect.com/science/article/pii/S0306460323003209; Meghan E. Morean, et. al., *Does it come from tobacco? Young adults' interpretations of the term "tobacco-free nicotine" in a cross-sectional national survey sample*, Plos One (May 13, 2022), https://doi.org/10.1371/journal.pone.0268464.

[67] *Consumers See Health and Well-being as "Essential" Spend Category, Accenture Survey Finds*, Accenture (Sept. 7, 2022), https://newsroom.accenture.com/news/2022/consumers-see-health-and-well-being-as-essential-spend-category-accenture-survey-finds.

[68] Danielle R. Davis et. al., *supra* note 67.

[69] Julia Chen-Sanke et al., *supra* note 65.

98.     The study also found that seeing the tobacco-free claim leads to a higher likelihood of using Puff Bar Products versus other e-cigarettes and a lower likelihood of perceiving Puff Bar use as "extremely or very harmful."[70]

99.     Another study found that a "tobacco-free nicotine" marketing message prompts the transition to and promotes a price premium for such products.[71]

100.     Consumers, especially young people, are misled by the "tobacco-free" nicotine messaging, perceiving the Products as safer than they are or to be less harmful than other products containing tobacco-derived nicotine.

101.     Consumer perception is far from accurate. In reality, Puff Bar Products pose significant health concerns based on nicotine content, harmful chemicals, and toxins.

102.     The Products contain nicotine, which is highly addictive with known adverse health effects.[72]

103.     Recent research specifically into the effects of

104.     Puff Bar has found that nicotine use during adolescence can harm the brain and lead to a variety of developmental risks.[73] Compared with older adults, youth and young adults have brains more vulnerable to the negative consequences of nicotine exposure.[74] The effects

---

[70] *Id.*

[71] Kendra Ratnapradipa et al., *Randomised Experiment for the Effect of 'Tobacco-Free Nicotine' Messaging on Current E-Cigarette Users' Perceptions, Preferences and Intentions*, 33(4) Tobacco Control 441-48 (June 20, 2024), https://pubmed.ncbi.nlm.nih.gov/36596708/.

[72] Aseem Mishra et al., *Harmful Effects of Nicotine*, 36(1) Indian J. of Med. and Paediatric Oncology 24-31 (Jan.-Mar. 2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4363846/; *see also Health Effects of Vaping*, CDC (May 15, 2024), https://www.cdc.gov/tobacco/e-cigarettes/health-effects.html.

[73] Hannah Rosenthal et al., *Puff Bars: A Dangerous Trend in Adolescent Disposable E-Cigarette Use*, 34 Current Op. in Pediatrics 288-94 (June 1, 2022), https://pubmed.ncbi.nlm.nih.gov/35152232/.

[74] *E-Cigarette Use Among Youth and Young Adults: A Report of the Surgeon General*, U.S. Pub. Health Serv., at 104 (2016), https://www.cdc.gov/tobacco/data_statistics/sgr/e-cigarettes/pdfs/2016_sgr_entire_report_508.pdf.

include reduced impulse control, deficits in attention and cognition, mood disorders, and harm to mental health.[75]

105.    Apart from the nicotine harms of vaping, research shows vaping can increase the risk of lung disease, lung damage, heart disease, heart attack, asthma complications, and chronic coughing and wheezing.[76]

106.    Puff Bar Products also contain aerosol, which is not harmless water vapor. It often contains toxic substances, including carcinogenic chemicals; heavy metals such as nickel, tin, and lead; tiny particles that can be inhaled deep into the lungs; volatile organic compounds; and flavorings such as diacetyl, a chemical linked to a serious lung disease.[77]

107.    All of the harmful characteristics of the Products are also generally associated with tobacco or tobacco-derived nicotine Products; to represent that the Products are "tobacco-free" implies these risks are not present, which is seriously misleading.

108.    On its website, Puff Bar includes a mandatory California Prop 65 warning, stating that the Products can expose users to chemicals "including glycidol, which is known to the State of California to cause cancer."[78] But the website does not go on to disclose the many additional risks of the Product. Even the mandatory Prop 65 warning is fine print and difficult to see; the much larger "tobacco-free" label on the website and on the packaging overwhelms the disclosure,

---

[75] *Id.*; *see also Quick Facts on the Risks of E-cigarettes for Kids, Teens, and Young Adults*, Ctr. for Disease Control and Prevention (June 23, 2022), https://www.cdc.gov/tobacco/basic_information/e-cigarettes/Quick-Facts-on-the-Risks-of-E-cigarettes-for-Kids-Teens-and-Young-Adults.html#two.

[76] *What Parents Need to Know About the E-Cigarette Named Puff Bar*, Evolve (Nov. 30, 2021), https://evolvetreatment.com/blog/puff-bar-e-cigarette/.

[77]*About E-Cigarettes (Vapes)*, CDC (May 15, 2024), https://www.cdc.gov/tobacco/e-cigarettes/about.html?CDC_AAref_Val=https://www.cdc.gov/tobacco/basic_information/e-cigarettes/about-e-cigarettes.html.

[78] Puff Bar, https://puffbar.com/ (last visited Sept. 26, 2024).

suggesting that even if the Products do contain potentially harmful chemicals, they still are a safer alternative to tobacco-derived nicotine products.

109.    Puff Bar's warning that the Products contain nicotine—which, like the Prop 65 disclosure, is mandatory—presents the minimum information possible, with no disclosure about the health consequences of nicotine, in order to assuage customer concern, especially when coupled with nicotine percentage labels that imply that the nicotine levels in these Products are low or otherwise benign.

110.    In summary, Defendants' use of the term "tobacco-free" in the Products' advertising misleads consumers to believe that the Products are safer than they are or that the Products lack the safety risks associated with tobacco-derived nicotine products.

## CLASS ALLEGATIONS

111.     Plaintiff Amiel re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

112.    Plaintiff Amiel brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all other similarly situated individuals within the United States (the "Class"), defined as follows: all consumers who purchased the Products within the United States during the applicable statute of limitations period (the "Class Period") and until the date of class certification.

113.    Included in the Class, to the extent necessary, is a subclass of all persons who purchased the Products (as defined herein) in New York during the Class Period (the "New York Subclass").

CLASS ACTION COMPLAINT

114.    Excluded from the Class are (1) Defendants, any entity or division in which either Defendant has a controlling interest, and Defendants' legal representatives, officers, directors, assigns, and successors; and (2) the judge to whom this case is assigned and the judge's staff.

115.    There are substantial questions of law and fact common to all members of the Class, which will predominate over any individual issues. These common questions of law and fact include, without limitation:

(a)    Whether Defendants are responsible for the marketing at issue;

(b)    Whether the marketing of the Products was unfair, misleading, false, deceptive, fraudulent, and/or unlawful;

(c)    Whether the sale of the Products in contexts where sale was unlawful was unfair, misleading, false, deceptive, fraudulent, and/or unlawful; and

(d)    Whether Defendants' conduct as set forth above injured Plaintiff Amiel and Class members.

116.    Plaintiff Amiel's claims are typical of the claims of the Class. Plaintiff Amiel is a member of a well-defined class of similarly situated persons, and the members of the Class were similarly affected by Puff Bar's conduct and are owed the same relief, as alleged in this Complaint.

117.    The precise number of the Class members and their identities are unknown to Plaintiff Amiel at this time but may be determined through discovery.

118.    Plaintiff Amiel will fairly and adequately protect the interests of the Class and has no interests that are antagonistic to the claims of the Class. Plaintiff Amiel will vigorously pursue the claims of the Class and Subclass.

119.    Plaintiff Amiel has retained counsel who are competent and experienced in consumer protection litigation, including class actions relating to false advertising. Plaintiff

Amiel's counsel have successfully represented plaintiffs in complex class actions and currently represent plaintiffs in similar complex class action lawsuits involving false advertising.

120.    A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of Plaintiff Amiel and the Class are nearly identical and will require evidentiary proof of the same kind and application of the same laws. There is no plain, speedy, or adequate remedy other than by maintenance of this class action.

121.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because Class members number in the thousands and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually, and the disposition of this case as part of a single class action will benefit the parties and reduce the aggregate judicial resources that would be spent if this matter were handled as hundreds or thousands of separate lawsuits. Trial of Plaintiff Amiel's and the Class members' claims together is manageable.

122.    No member of the Class has a substantial interest in individually controlling the prosecution of a separate action.

123.    The prerequisites to maintaining a class action for equitable relief are met. Defendants intentionally target young adult buyers when it is illegal for people younger than age 21 to purchase the Products; Defendants market, sold, and allow the sale of the illegal Products; Defendants represent that Puff Bar Products are 5% nicotine without providing additional information; and Defendants have marketed the Products as "tobacco-free," which implies that the Products are safer than tobacco-derived nicotine products. Defendants designed the Products,

and Defendants oversee the manufacturing and distribution of the Products. The Products as designed and distributed by Defendants are still in circulation, the representations are live and continue to pose a risk of harm to consumers, and Defendants have a continuing responsibility to mitigate or prevent that harm. Defendants continue to benefit from sales by resellers, including ongoing brand advertising and visibility, licensing fees and royalties, residual profits from inventory sales, and continued distribution and sale of the Products. Defendants are therefore responsible for how the Products are marketed, labeled, and represented to consumers and are responsible for ensuring issues with the Products are addressed, including misleading representations and omissions, safety concerns, and regulatory compliance, regardless of when or how the Product is sold. Defendants therefore have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final equitable and monetary relief with respect to the Class as a whole.

124.    The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Puff Bar. Additionally, individual actions could be dispositive of the interests of the Class even where certain Class members are not parties to such actions.

125.    Defendants' conduct is generally applicable to the Class as a whole, and Plaintiff Amiel seeks, *inter alia*, equitable remedies with respect to the Class as a whole. As such, Puff Bar's systematic policies and practices make declaratory relief appropriate with respect to the Class as a whole.

126.    Defendants' improper consumer-oriented conduct is misleading in a material way in that the marketing, *inter alia*, induced Plaintiff Amiel, New York Subclass members, and all

Class members to purchase and/or to pay the requested price for the Products, and caused them to continue buying the addictive Products, when they otherwise would not have started using the Products, would not be continuing to use the Products, or would not be paying the requested price.

127.     Defendants made the misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

128.     Plaintiff Amiel, the New York Subclass members, and the Class members have been injured by their purchase of the Products, which they otherwise would not have purchased and would not be continuing to use, which were worth less than what they bargained and/or paid for, which they paid the requested price for, and which they selected over other products that may have been truthfully marketed.

129.     Puff Bar's advertising induced Plaintiff Amiel, the New York Subclass members, and all the Class members to start using and buying the Products, to buy more of them and continue buying them, and/or to pay the price requested.

130.     As a direct and proximate result of Defendants' violation of law, Plaintiff Amiel, members of the New York Subclass, and all Class members paid for falsely advertised Products and, as such, have suffered damages in an amount to be determined at trial.

131.     Injunctive relief is also appropriate in this case because Plaintiff Amiel, members of the New York Class, and other Class members have through Defendants' conduct become addicted to e-cigarettes and therefore have a perpetual relationship with these nicotine Products and will continue to purchase them. Even if working hard to discontinue vaping, Plaintiff Amiel and other Class members remain consumers and have a strong interest in having full disclosure

regarding the Products. Plaintiff Amiel and other Class members wish to be able to make the best choices among e-cigarettes, in terms of health dangers, accurate description of nicotine, increased tendency for addiction through the use of flavors, and price. Because future harm is likely at the hands of Defendants, injunctive relief is appropriate in this case.

132.    Plaintiff Amiel knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance of a class action.

## CAUSES OF ACTION

## COUNT I

**Violations of the New York General Business Law § 349
(On Behalf of Plaintiff Amiel and the New York Subclass)**

133.    Plaintiff Amiel realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

134.    The acts of Defendants, as described above, and each of them, constitute unlawful, deceptive, and fraudulent business acts and practices.

135.    Defendants market their Products to young people, misleading them as to the fact that it is illegal in all states to sell these Products to people under 21 years of age.

136.    Defendants market and have sold, and have allowed resellers to market and sell, the Products, misleading consumers as to the fact that the Products are not legally for sale.

137.    Puff Bar markets the Products as "5%" or "5% nicotine," which misleads customers to think the Products deliver a low amount of nicotine, and are less addictive than they are, and is ambiguous regarding a material component of the Products.

138.    Defendants also market and advertise their Products as "tobacco-free," which misleads consumers to think that the Products are safer than they are.

139.    Defendants made the misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

140.    Puff Bar has violated § 349 of the New York General Business Law ("NYGBL"), which makes deceptive acts and practices unlawful. As a direct and proximate result of Defendants' violation of § 349, Plaintiff Amiel and other members of the New York Subclass have suffered damages in an amount to be determined at trial.

141.    By reason of the foregoing, Plaintiff Amiel and the New York Subclass members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 349(h).

### <u>COUNT II</u>
**Violations of the New York General Business Law § 350**
**(On Behalf of Plaintiff and the New York Subclass)**

142.    Plaintiff Amiel realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

143.    The acts of Defendants, as described above, and each of them, constitute false advertising in that each is misleading in material respects as described *supra* ¶¶ 47-108.

144.    New York General Business Law § 350 provides: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

145.    NYGBL § 350-a defines "false advertising," in relevant part, as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

146.    Defendants made the false statements willfully, wantonly, and with reckless disregard for the truth.

147.    Plaintiff Amiel and the New York Subclass members have been injured by their purchase of the Products. As a direct and proximate result of Defendants' violation of § 350, Plaintiff Amiel and other members of the New York Subclass have suffered damages in an amount to be determined at trial.

148.    On August 30, 2024, a pre-suit letter was sent to all the Defendants via certified mail that provided notice of the violations of state consumer protection statutes and demanded that within thirty (30) days from the date of the letter, Defendants correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein. The letter also stated that if the Defendants refused to do so, a complaint seeking damages would be filed. Defendants received the letter on September 5, 2024, but they have failed to take corrective action.

149.    Accordingly, Plaintiff Amiel, on behalf of herself and all other members of the New York Subclass, seeks compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendants' acts and practices.

## COUNT III

### Violation of State Consumer Protection Statutes
### (on Behalf of Plaintiff Amiel and All Class Members)

150.    Plaintiff Amiel realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

151.    Defendants' unfair, false, misleading, and fraudulent practices in marketing the Products, as alleged herein, violate each of the following state consumer protection statutes to the extent that Defendant's Products have been marketed in, and purchased by Class members in, the respective state: Ala. Code § 8-19-5(27); Alaska Stat. § 45.50.471(a); Ariz. Rev. Stat.

§ 44-1522; Ark. Code § 4-88-107(a), (a)(10); Cal. Civ. Code § 1750, Cal. Bus. & Prof. Code §§ 17200, 17500, 17580.5; Colo. Rev. Stat. §§ 6-1-105 (e), (g); Conn. Gen. Stat.§ 42-110b(a); Del. Code Ann. tit. 6, § 2513(a); Fla. Stat. Ann. § 501.204; Ga. Code § 10-1-393(a); Haw. Rev. Stat. § 480-2(a), (d); Idaho Code § 48-603(17); 815 Ill. Comp. Stat. Ann. § 505/2; Ind. Code § 24-5-0.5-3(a); Iowa Code § 714H.3(1); Kan. Stat. § 50-626(a); Ky. Rev. Stat. § 367.170; La. Rev. Stat. Ann. § 51:1405(A); Me. Rev. Stat. Ann. tit. 5 § 207; Md. Code Comm. Law § 13-301(1), (3); § 13-303; Mass. Gen. Laws Ch. 93A, § 2(a); Mich. Comp. Laws Ann. § 445.903(1)(s), (bb), (cc); Minn. Stat. § 325F.69(1); Miss. Code § 75-24-5(2)(e),(g); Mo. Rev. Stat. § 407.020(1); Mont. Code § 30-14-103; Neb. Rev. Stat. § 59-1602; Nev. Rev. Stat. § 598.0915(15); N.H. Rev. Stat. § 358-A:2; N.J. Stat. Ann. § 56:8-2; N.M. Stat. Ann. §§ 57-12-2(D), 57-12-3; N.Y. Gen. Bus. Law §§ 349, 350; N.C. Gen. Stat. § 75-1.1(a); N.D. Century Code §§ 51-15-02, 51-15-02.3; Ohio Rev. Code § 1345.02; Okla. Stat. Ann. tit. 15, §§ 753, 752(13); Or. Rev. Stat. § 646.608(1); 73 Pa. Stat. § 201-2(4); R.I. Gen. Laws §§ 6-13.1-1(6)(xii), (xiii), (xiv), 6-13.1-2; S.C. Code § 39-5-20(a); S.D. Codified Laws § 37-24-6(1); Tenn. Code § 47-18-104(a); Tex. Bus. & Com. Code § 17.46(b)(2),(3),(5),(7),(24); Utah Code Ann. § 13-11-4(1); Vt. Stat. Ann. tit. 9, § 2453(a); Va. Code Ann. § 59.1-200(A)(14); Wash. Rev. Code § 19.86.020; W. Va. Code §§ 46A-6-102(7); Wis. Stat. Ann. § 100.18(1); Wyo. Stat. Ann. § 40-12-105(a)(xv).

152.    Defendants made the misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

153.    Plaintiff Amiel and all Class members have been injured by their purchase of the Products.

154.    As a direct and proximate result of Defendants' violation of consumer protection law, Plaintiff Amiel and all other Class members have suffered damages in an amount to be determined at trial.

155.    On August 30, 2024, a pre-suit letter was sent to all Defendants via certified mail that provided notice of Defendant's violations of state consumer protection statutes and demanded that within thirty (30) days from the date of the letter, Defendants correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein. The letter also stated that if Defendants refused to do so, a complaint seeking damages would be filed. Defendants received the letter on September 5, 2024, but they have failed to take corrective action. Accordingly, Amiel, on behalf of herself and all other members of the Class, seeks compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendant's acts and practices, according to the availability of relief under the applicable statutes.

### COUNT IV
**Breach of Implied Warranty of Merchantability**
**(on Behalf of Plaintiff Amiel and All Class Members)**

156.    Plaintiff Amiel realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

157.    Plaintiff purchased the Products from resellers inside and outside of this District.

158.    The Products were not altered by Plaintiff or by Class members.

159.    At the time of purchase, Defendants warranted that the Products were "tobacco-free," which implied that the Products would not have the safety risks associated with tobacco or tobacco-derived nicotine products, or that the Products are safer than they really are. In actuality,

these Products pose significant health concerns based on nicotine content, harmful toxins, and chemicals.

160.    Defendants, therefore, breached the warranty implied at the time of sale in that Plaintiff and the other members of the Class did not receive goods that were as represented, and the goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, advertised, packaged, labeled, or sold.

161.    Defendants knew that the Products contained nicotine, harmful chemicals, compounds, and toxins—dangers which mirror in many ways the dangers of tobacco or tobacco-derived nicotine products—yet Defendants advertised the Products as "tobacco-free" anyway, deceiving Plaintiff and the Class.

162.    Defendants also took no action to remedy the inferiority or to cure the breach.

163.    As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class members have been injured and harmed because they would not have purchased the Products if they knew the truth about the Products, namely, that they were unfit for use and posed a significant safety risk.

164.    Among other things, Plaintiff and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above. Moreover, had Plaintiff and the Class members known the true facts, they either would not have purchased the Products, would have purchased fewer Products, or would not have been willing to pay the premium price Defendants charged for the Products.

165.    Plaintiff, on behalf of herself and the Class, seeks compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Amiel respectfully requests that the Court enter judgment in her favor and in favor of the Class as follows:

A.      An order certifying the proposed Class and New York Subclass; appointing Plaintiff Amiel as representative of the Class and New York Subclass; and appointing Plaintiff Amiel's undersigned counsel as counsel for the Class and New York Subclass;

B.      A declaration that Defendants are financially responsible for notifying Class members of the pendency of this suit;

C.      An order declaring that Defendants' conduct violates the statutes referenced herein;

D.      An order awarding monetary damages, including actual damages, statutory damages, compensatory, and punitive damages, in the maximum amount provided by law under the common law and the statutes named herein;

E.      Injunctive relief;

F.      An order for prejudgment interest on all amounts awarded;

G.      An order awarding Plaintiff Amiel and the other Class members the reasonable costs and expenses of suit, including their attorneys' fees; and

H.      Any further relief that the Court may deem appropriate.

## JURY TRIAL DEMANDED

Plaintiff Amiel hereby demands a trial by jury.

CLASS ACTION COMPLAINT

DATED: September 27, 2024          Respectfully submitted,

**RICHMAN LAW & POLICY**

_____

Kim E. Richman
1 Bridge Street, Suite 83
Irvington, NY 10533
Telephone: (914) 693-2018
krichman@richmanlawpolicy.com

*Attorney for Plaintiff Amiel*
*and Proposed Class*